# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYRA A. HENDRICKS,           ) | |
| Plaintiff,           ) | |
| v.           ) | Civil Action No. 03-2239 (RMC) |
| HENRY M. PAULSON, JR.,[1]           ) | |
| Secretary of the Treasury           ) | |
| Defendant.           ) | |

## MEMORANDUM OPINION

Myra A. Hendricks was a Special Agent of the Treasury Inspector General for Tax Administration ("TIGTA") until she left that job on August 6, 2004. She instituted this lawsuit in 2003 and has amended it thereafter, bringing forth allegations that she suffered discrimination, harassment, and a hostile work environment, that she was retaliated against, and that she was constructively discharged, due to her race, African American, and gender, female, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[2] Secretary of the Treasury Henry M. Paulson, Jr., sued in his official capacity, denies all allegations. After full discovery, Treasury moved for summary judgment in its favor. The Court has reviewed the extensive record and briefs

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Henry M. Paulson, Jr. is substituted as defendant in this action. *See* Fed. R. Civ. P. 25(d).

[2] While Plaintiff's Amended Complaint originally contained five non-selection claims and a claim for age discrimination relating to each of those five non-selections, she has since decided not to pursue one of the non-selections, for which a white female was selected, and not to pursue her age discrimination claim for any of the non-selections. Plaintiff also pursues her prior claims relating certain letters of reprimand and counseling, and an alleged failure to select her for acting positions in the context of her hostile work environment and constructive discharge claims.

with great care and concludes that there are no genuine and material fact issues in dispute and that summary judgment should be entered in Treasury's favor as a matter of law.

## I.  BACKGROUND FACTS

### A.  The Agency and Its Selection Policies

Pursuant to the IRS Restructuring Act, in 1998 the Office of Investigations of IRS Internal Security became the Washington Office of Investigations under the new Treasury Inspector General for Tax Administration ("TIGTA").  *See* Pl.'s Second Am. Compl. and Demand for Jury Trial [Dkt. #49] ("SAC") ¶ 14.  The name of the office changed two more times, eventually becoming the Special Inquiries and Inspection Division in 1999.  *Id.*  In 2002, the Special Inquiries and Inspection Division's name changed to the Special Inquiries and Intelligence Division ("SIID").  *Id.*  SIID is the elite investigative division within TIGTA.  *Id.* ¶ 16.  Its special agents handle sensitive investigations, including allegations of misconduct by IRS Chief Counsel employees, the IRS Commissioner's Advisory Board, IRS Senior Executives, IRS GS-15 management officials, TIGTA Special Agents, and Internal Revenue Service Special Agents assigned to the Criminal Investigation Division.  *Id.* ¶ 16.  Special Agents in SIID conduct investigations, write reports of investigation, interview witnesses and complainants, work with the Office of the U.S. Attorney to prosecute subjects of investigations, and testify before grand juries.  *See id.* ¶ 17.

The TIGTA Operations Manual contains the agency's policies, standards and procedures for Merit Staffing.  *See* Chapter (600) 70.5 of the Operations Manual ("Operations Manual") (Def.'s Ex. 21). When selecting candidates for promotion to vacant positions, the TIGTA must "formally evaluat[e] [all qualified/eligible candidates] against the knowledge, abilities, skills, and other characteristics ("KSAs") stated in the vacancy announcement . . . determined to be

important to the position being filled." *Id*. at 531-32.

> To ensure the integrity and reliability of the candidate evaluation procedures, a merit staffing panel or ranking official will evaluate candidates against KSAs. Use of a panel or a ranking official is at the discretion of the selecting official. Panel members or ranking officials must be at least the grade level of the position to be filled. The panel members for all supervisory positions must be supervisors themselves. If a panel is used, it shall be generally composed of three members. Whenever possible, at least one (and preferably two or more) voting members will have a substantive/technical knowledge of the position to be filled . . . The primary function of the panel/ranking official will be to rank all basically qualified candidates against established evaluation criteria. The outcome of this process is a determination of the best qualified candidates.

*Id*. at 532. TIGTA policy indicates that "[t]he selecting official has the discretion to interview or not interview any noncompetitive[3] applicant certified for selection." *Id*. With respect to competitive applicants, TIGTA policy indicates that if one competitive applicant is interviewed, then all competitive applicants must be interviewed. *Id*.

### B. The Claims

Ms. Hendricks is an African-American woman who was a GS-13 Special Agent in TIGTA until August 6, 2004. She began working for the IRS in 1984 as a GS-4 secretary in the Collection Division and worked her way up until she was promoted to the position of Special Investigator, GS-13, in 1997. SAC ¶¶ 1-2. Ms. Hendricks complains that she was passed over for promotion on four occasions, subjected to unwarranted discipline, denied career-enhancing "acting"

---

[3] The difference between applicants on the noncompetitive list and those on the competitive list is that noncompetitive individuals are already at the pay level of the vacant position and can be selected without consideration of other applicants. See Def.'s Mot. for Summ. J., Def.'s Statement of Material Fact Not in Dispute ("Def.'s Facts") ¶ 49 (the Court makes references only to the facts not disputed by Plaintiff and notes where Plaintiff contests Defendant's facts); Hendricks Dep. 7/7/05 at 85-86.

assignments to fill in for absent superiors, subjected to harassment and a hostile work environment, and constructively discharged.

### 1.   2000 Application for GS-14 Criminal Investigator (TG2011)

Ms. Hendricks applied for the position of GS-14 non-supervisory criminal investigator in March 2000, pursuant to Vacancy Announcement TG2011.  SAC ¶ 39.  Robert Johnson, a white male, was selected for the position.  *Id.*

Then-Assistant Special Agent in Charge ("ASAC") Tim Camus served as the ranking official for TG2011.  Deposition of Timothy Camus ("Camus Dep.") at 68.  He used four ranking criteria[4] and gave points to each applicant on the Best Qualified List accordingly.  *Id.* at 73-75.  Robert Johnson (Caucasian male), Jean Keller (Caucasian female), and Michael Radetic (Caucasian male) all received a score of 10 on each of the four criteria.  Ms. Hendricks received a rating of 7 for the first criterion, 10 for the second, 7 for the third, and 10 for the fourth.  Mr. Camus states that he did not give Ms. Hendricks a higher score on the first criterion because her submission did not

---

[4]   *See* Def.'s Mem., Ex. 2 at 1, Ranking Criteria ("1.   Ability to Initiate and Conduct Proactive Investigations; 2.   Ability to Independently Plan, Organize, Prioritize, and Conduct Complex Investigations; 3. Ability to Communicate in Writing; 4. Ability to Communicate, Work Effectively With and Lead Others.")  These criteria were further defined with examples.   For instance, as to the first criterion (Ability to Initiate and Conduct Proactive Investigations), a superior level of performance was defined as someone who "[a]ctively identifies, develops, uses and controls confidential informants and sources of information.  Also actively seeks to develop additional proactive investigations by originating ideas for integrity probes consistent with TIGTA's Integrity Program guidelines, and by recognizing instances where other cases can be generated from existing investigations."   Performance at the superior level earned 10 points.   A satisfactory level of performance was defined as someone with the "[a]bility to identify and develop confidential informants and sources of information. Also actively seeks to develop additional investigations by recognizing instances where other cases can be generated from existing investigations."   This satisfactory level earned 7 points.  Finally, a "barely acceptable" level of performance was defined as someone with the "[a]bility to identify and develop confidential informants and sources of information."   This level of performance earned 4  points.   Similar kinds of definitions were provided for each criterion.

indicate that she had used confidential informants or confidential sources or that she had "generated proactive investigative accomplishments." Camus Decl. 6/7/02 at 5. Mr. Camus states that he did not give Ms. Hendricks a higher score on the third criterion because her submission did not indicate "that she prepared reports concerning highly sensitive, complex, multi-agency-multi allegation investigations." *Id.* As discussed below, Ms. Hendricks challenges these statements.[5] Mr. Camus recommended that Mr. Johnson be promoted. *Id.* The selecting official, then-Special Agent in Charge ("SAC") Brian Dwyer, selected Mr. Johnson for the position on March 23, 2000. Def.'s Facts ¶ 8.

Ms. Hendricks asserts that she was more qualified for the job than Mr. Johnson. SAC ¶ 40. She also alleges that Mr. Johnson had a history of misconduct which compared badly to her unblemished record. *Id.* ¶¶ 42-43. In 1991, Mr. Johnson had engaged in a fistfight when he had been drinking while off duty. Although off duty, he was wearing his official firearm, which he lost in the melee. Deposition of Robert Johnson ("Johnson Dep.") at 48-50; Pl.'s Mem. of P. & A. in Opp'n to Mot. for Summ. J. (Pl.'s Opp.") at 13. The firearm was returned to TIGTA by the Laurel, Maryland, police. *Id.* In addition, in 1995, Mr. Johnson was suspended for two days for using his government-owned vehicle ("GOV") to, *inter alia*, transport two unauthorized passengers. Johnson Dep. at 55-59. Mr. Dwyer discussed Mr. Johnson's disciplinary record with his supervisor prior to the selection and determined that it was " 'not a problem' to bring Mr. Johnson into SIID because he had fulfilled his punishment." Deposition of Bryan Dwyer ("Dwyer Dep.") at 67; Pl.'s Opp. at 14. At least one other manager in SIID disagreed and thought that Mr. Johnson could never

---

[5] Ms. Hendricks's Statement of Genuine Issues ("Pl.'s Issues") lists 14 material facts that she states are genuinely at issue. *See* Pl.'s Issues at 51-68.

investigate other persons " 'based on his own integrity issues.' " Pl.'s Opp. at 14 (citing Deposition of ASAC Karen Parker-McGill ("Parker-McGill Dep.") at 20).

  The Application Package for Mr. Johnson, Def.'s Mem., Ex. 6, shows that Mr. Johnson had worked as a criminal investigator for the IRS and TIGTA for fourteen years in the Baltimore Field Division.  His experience included undercover operations, joint investigations with other federal law enforcement agencies, an internal investigation of a TIGTA Special Agent, an investigation into the kidnapping of an IRS criminal investigator, and international investigations. *Id.* at 5-7.  He received performance awards in 1987, 1990, 1991, 1996, 1997, 1998, and 1999, as well as various manager's awards and special act awards.  *Id*. at 7-8.  In his most recent performance appraisal before his promotion, covering June 1,1998 to May 31, 1999, Mr. Johnson received five out of five, the highest score possible, for the following job elements: Conducting Investigations, Preparation of Reports, Inventory Management, Interpersonal Skills, and Other Assignments and Duties. *Id*. at 9.  He received a grade of four for Case Development. *Id.*  According to his evaluation, Mr. Johnson's written products were "meticulously prepared," "clear, complete and concise," "timely and with no need for correction," "identified all aspects of the issues being presented," "prepared in a manner that allows the reader to quickly and easily understand the entire scope of the investigation," and had "few equals."  *Id.* at 13.

  The Application Package for Ms. Hendricks, Def.'s Mem., Ex. 7, shows that she became a criminal investigator in May 1992 and had eight years' experience.  From 1993 until 2000, Ms. Hendricks served as a Technical Service Officer and then a Regional Technical Service Officer

("RTSO") in addition to her duties as a criminal investigator.[6] Deposition of Myra Hendricks ("Hendricks Dep.") 7/6/05 at 17-22.   Ms. Hendricks's application indicates that she received performance awards in 1992 and 1997.  *See* Def.'s Mem., Ex. 7 at 42.  She received a manager's award in 1994, an IRS Commissioner Protection Detail award in 1998, and a special act award in 1998.  *Id.*  In her performance appraisal covering the same time frame as Mr. Johnson's, Ms. Hendricks received a rating of five out of five for the following job elements: Coordinate Technical Equipment and Operations Program, Interpersonal Relations, and Other Assignments and Duties. *Id*. at 32.  She received a four for Conducting Investigations and Case Development.  *Id.*  She received a rating of three for Preparation of Reports and Inventory Management. *Id.*  Her evaluation noted that she was assigned as the RTSO for the National Office. *Id*. at 35.  She was "called upon to perform an unusual number of supplementary tasks" due to this assignment because of "ongoing changes in the organization."  *Id.* at 35.

> As such, she devoted the vast majority [of] her time to supporting National Office operations in the technical equipment area.  Despite this extraordinary effort as the National Office RTSO, she had an inventory of criminal and administrative cases to manage.  Incredibly, all of the above-cited tasks did not deter her from uncovering and developing possible investigations, and assisting other agents with their investigations.  She was an invaluable resource for the office, providing both investigative and technical support for other investigators and managers.

*Id.*  Ms. Hendricks carried a smaller caseload of investigations than other agents and her reports were

---

[6] "As part of her duties [as RTSO], Ms. Hendricks supported the agents in those offices with their technical surveillance needs; conducted electronic monitoring; installed audio and video equipment; maintained the equipment usage logs; ordered equipment for all of the headquarters functions; maintained the  radio equipment both for the vehicles and for handheld use; attended, planned and conducted tech-related training; prepared quarterly usage and annual reconciliation reports for headquarters' equipment; maintained vehicle logs and registrations for the office; and maintained the vehicles used for surveillance purposes."   Declaration of Myra Hendricks ("Hendricks Decl.") at ¶ 28.

"not always submitted within the required time frames." *Id.* at 40.

### 2.  2001 Application for GS-14 Criminal Investigator[7] (TG2114)

In October 2001, TIGTA posted Vacancy Announcement TG-2114, for a non-supervisory criminal investigator, GS-1811-14, in SIID.  Ms. Hendricks submitted her application, but Steven Geary, a white male, was selected.  SAC ¶ 27.  Ms. Hendricks alleges that she was more qualified than Mr. Geary, *id.* ¶ 28, that Mr. Geary had been placed in an acting position earlier in the spring of 2001 to enhance his credentials, *id.* ¶ 29, and that Ms. Hendricks was not given the opportunity to participate in career-enhancing acting opportunities within SIID.  *Id.* ¶ 30.

On this occasion, a panel of three ASACs within SIID acted as the rating panel.  Def.'s Facts ¶ 14.  The panel included Jim Rice (Caucasian male), Tim Camus (Caucasian male), and Dedra Drayton (African-American female). *Id.*  Using the same four criteria as on the selection for Vacancy Announcement TG2011, the panel members prepared worksheets for each application reviewed and scored each applicant accordingly.   Def.'s Facts ¶ 16.   Ms. Drayton gave Ms. Hendricks a rating of 7 for criterion one, 7 for criterion two, 10 for criterion three, and 7 for criterion four.  Declaration of Dedra Drayton ("Drayton Decl.") ¶ 11; Def.'s Mem., Ex. 9.  Ms. Drayton gave Mr. Geary a rating of 7 for criterion one, 7 for criterion two, 10 for criterion three, and 10 for criterion four.  Drayton Decl. ¶ 14; Def.'s Mem., Ex. 9.[8]  Mr. Rice gave Ms. Hendricks 7 for the first

---

[7]  The Second Amended Complaint states that Ms. Hendricks applied for this position in January of 2002.  SAC ¶ 27.  The record indicates that the vacancy was posted in October 2001, applicants were ranked in November 2001, and the selection made on December 20, 2001.  Since the SAC references Vacancy Announcement TG2114, the Court has determined that it relates to the vacancy that was announced in October 2001 of the same number.  See Def.'s Ex. 13 (Ms. Hendricks's application is date-stamped received October 16, 2001).

[8]  Ms. Drayton changed her score for Mr. Geary from a 7 to a 10 on the Ranking Factor "Ability to Communicate, Work Effectively With and Lead Others" which raised his overall score

criterion, 10 for the second, 7 for the third, and 7 for the fourth.  Def.'s Mem., Ex. 9.  Mr. Camus

gave her 7 for the first criterion, 7 for the second, 7 for the third, and 10 for the fourth. *Id*. Thus, Ms.

Hendricks received a total score of 93.  *Id.*  Mr. Geary's total score was 102.  *Id*.

> The panel of Messrs. Rice and Camus and Ms. Drayton also interviewed each of the

candidates on the Best Qualified list, including Ms. Hendricks.  Drayton Decl. ¶ 16  Ms. Drayton

developed a list of questions that was asked of each candidate.  Def.'s Mem., Declaration of James

Rice ("Rice Decl.") ¶ 4.  Although her interview went well, Ms. Hendricks was not selected.[9]  Mr.

Rice stated that he recommended Mr. Geary to Mr. Dwyer, the selecting official, because Mr. Geary

> demonstrated the skill to focus on the specific allegations [he was] to
> investigate, to address these issues, and to close investigations in a timely
> manner. [Mr.] Geary . . . also demonstrated leadership characteristics by
> conducting [his] assignments with little or no supervision, conducting [his]
> investigation timely, and producing on each occasion quality reports of
> investigations.   In contrast, [Ms. Hendricks] takes forever to close

---

from Ms. Drayton from a 31 to a 34.  Pl.'s Issues ¶ IV.C.  Ms. Hendricks notes that Ms. Drayton was
selected for promotion over Ms. Hendricks in approximately June of 2001. *Id*. IV.D. Ms. Hendricks
states that she told Ms. Drayton that her selection was due to retaliation by Mr. Dwyer in an effort
to thwart Ms. Hendricks's activity related to equal employment opportunity ("EEO").  *Id.*  Ms
Hendricks represents that "[t]he substance of Ms. Drayton's response was that she knew why she
was selected, and that she would allow herself to be a pawn if it meant getting the job." *Id.* Without
exactly saying so, Ms. Hendricks suggests that Ms. Drayton's change of score indicates that she was
a "pawn" again. Ms. Drayton denies that she was influenced in any way in her evaluation of the
candidates.  Drayton Decl. ¶ 12.  The Court does not have to resolve this tangential matter.  Ms.
Hendricks's final score from the Interview Panel was 93 and Mr. Geary's was 102.  A reduction of
three points from Mr. Geary's score would not have lowered him to, or below, Ms. Hendricks's
score.  Further, Ms. Hendricks accuses Ms. Drayton of being a "pawn" for senior management in
every decision in which she participated that is under review here.  Ms. Drayton submits sworn
statements that contradict Ms. Hendricks's supposition.  An insinuation without any evidence cannot
overcome a statement under the penalty of perjury.  *See Sliti v. Bush*, 407 F. Supp. 2d 116, 118
(D.D.C. 2005).

[9]  Ms. Drayton, for instance, noted on Ms. Hendricks' interview: "Examples good – not
complex cases" although they showed "intuitiveness and perseverance." *See* Def.'s Mem., Ex. 11
at 4 (Interview Panel's written notes from interviews).

> assignments and lacks the skill to take on more than one assignment at one time.

Rice Decl. ¶ 5.  Ms. Drayton also concluded that Mr. Geary "had more relevant and more overall experience to do the job" because his application package and interview "demonstrated more of an ability to work complex investigations and the requisite leadership abilities through interviews." Drayton Decl. ¶ 20.  With Mr. Camus's full agreement, the Interview Panel made a unanimous recommendation to Mr. Dwyer that Mr. Geary and Ms. Joanne Jensen were Best Qualified for the two vacancies. *Id.*, ¶¶ 21-22.  For the two open positions, Mr. Dwyer selected Ms. Jensen[10] and Mr. Geary.  Def.'s Mem., Declaration of Brian Dwyer ("Dwyer Decl.") ¶ 4.

The application package for Mr. Geary showed that he had spent four years as a police officer with responsibilities for interviewing witnesses, completing incident reports, serving and executing search warrants, and testifying in court, before joining the IRS as a criminal investigator in 1989. Def.'s Mem., Ex. 12. He had conducted over 150 criminal and administrative investigations and served as a Technical Support Officer.  *Id.* He had also been assigned to serve as Acting Assistant Special Agent in Charge.  *Id.*  Mr. Geary submitted two performance appraisals, one covering October 1, 2000 to September 30, 2001, and one covering February 12, 2000 to October 31, 2000.  *Id.*  The latter of these appraisals showed that Mr. Geary had received a mid-year evaluation in February 2000 of "Pass" on TIGTA's pass/fail appraisal system for special agents.  *Id.* By year's end, *i.e.*, October 31, 2000, he had raised his performance to a Pass Plus. *Id.*  He maintained that level of performance throughout the next year.  *Id.*

---

[10] Ms. Hendricks no longer challenges the selection of Ms. Jensen. *See* Pl.'s Issues at 13-14 (Ms. Jensen's "selection is no longer at issue in this action").  Likewise, the non-selection of Kent Jefferies is no longer an issue in this case.  As a result, their qualifications are not discussed.

Naturally, the work history submitted by Ms. Hendricks in connection with Vacancy Announcement TG2114 was substantially similar to that contained in her application for TG2011. *See* Def.'s Mem., Ex. 13.  Ms. Hendricks had received two additional awards in 2000 – a special act award and a manager's award – which she included in this application.  *See id.*  She also addressed more recent investigations and submitted her most recent performance appraisal for the period of November 1, 2000 to October 31, 2001.  This appraisal reflected ratings of "Pass" for her mid-year and final appraisal on all elements.

### 3. 2002 Application for Criminal Investigatory Senior Special Agent (02-FESB-210)

Ms. Hendricks applied for the position of GS-14 Senior Special Agent in SIID under vacancy announcement 02-FESB-210 in September 2002.  SAC ¶ 23; Def.'s Mem., Ex. 14.  Ron McKeever, a white male, was selected.[11] *Id*.

Tim Herlihy served as the subject matter expert and ranked the application packages. Deposition of Tim Herlihy ("Herlihy Dep.") at 28-29.  Based on Mr. Herlihy's rankings, the Bureau of Public Debt, which was providing personnel services to TIGTA, prepared two Best Qualified lists, one for "Competitive Eligibles" and one for "Non-competitive Eligibles." Def.'s Mem., Ex. 15.  Ms. Hendricks was listed on the list of Competitive Eligibles along with Mr. McKeever.  *Id*.

All candidates who made either Best Qualified list were interviewed by a panel consisting of ASAC Drayton (African-American female), ASAC Tim Upham (Caucasian male) and Special Agent Dwaine Brinson (African-American male).  Def.'s Facts ¶ 35. The interview was

---

[11]  Ms. Hendricks asserts that she has raised a "genuine issue over defendant's articulated reasons for its selection of Ronald McKeever", Pl.'s Issues at 54-56, and lists 11 facts in support. None of these facts is in dispute.

crucial to the interview panel's recommendation.   Mr. Brinson, a work friend of Ms. Hendricks, stated that "at the time of the interview, Ron McKeever answered the questions that I had very clearly, very concisely . . . I don't recall Myra Hendricks doing that . . . She did not answer the questions as clearly as Ron McKeever had answered the questions."  Deposition of Dwaine Brinson ("Brinson Dep.") at 34-35.  Mr. Brinson favorably compared Mr. McKeever's field experience – which he viewed as giving Mr. McKeever experience on multi-agency cases dealing with a wide spectrum of issues – to Ms. Hendricks's experience in SIID, which he viewed as presenting a more narrow scope of cases.  Brinson Dep. at 35-36.[12]  Mr. Brinson said the panel agreed that Mr. McKeever "was by far the best candidate."  Declaration of Dwaine Brinson ("Brinson Decl.") at 2. Ms. Drayton also concluded that Mr. McKeever had "worked more complex and/or more involved cases and was more qualified for the position than [Ms. Hendricks]."  Drayton Decl. ¶ 29.  Mr. Upham states that all candidates were asked the same questions, and that he ranked Ms. Hendricks the lowest among them.  Declaration of Timothy Upham ("Upham Decl.") ¶ 7.

The panel unanimously decided to recommend Mr. McKeever for the position. Drayton Decl. ¶ 29.  They told Richard Sherwood, then Special Agent in Charge, that Mr. McKeever's interview was "far and above all the other applicants." Deposition of Richard Sherwood

_____

[12] Ms. Hendricks denies only Mr. Brinson's comparison of field and SIID special agents but not that he held this view or that it influenced his evaluation of her and Mr. McKeever.  She asserts that "[i]nvestigators in SIID conduct the highest level investigations in the agency."  See Pl.'s Issues at 19.  "Mr. McKeever and agents in the field offices handled investigations of IRS employees below the GS-15 level."  Id.  Mr. Camus testified that field agents may investigate allegations concerning IRS executives as well as TIGTA agents.  Camus Dep. at 32 ("depending on resources and issues . . . a case may be referred out [to the field] to be worked on an executive").  Even without Mr. Camus's statement, however, Ms. Hendricks's denial goes to her personal evaluation of the work of SIID special agents and not to Mr. Brinson's non-discriminatory opinion that field agents have a greater likelihood of working on inter-agency and multi-agency matters than agents who have spent their careers in SIID.

("Sherwood Dep.") at 60-61.  The panel advised that Mr. McKeever provided "the most complete answers and that those answers reflected the broadest experience and growth potential of all candidates."  Declaration of Richard Sherwood ("Sherwood Decl.") at 1.  As SAC, Mr. Sherwood did not have the authority to make a GS-14 selection, which TIGTA policy required be made by an agency executive.  Def.'s Facts ¶ 40.  Based on the recommendation of the interview panel, Mr. Sherwood recommended that Steve Jones, then-Assistant Inspector General for Investigations, select Mr. McKeever for the position.  ¶¶ 39-40.[13]  Mr. Jones selected Mr. McKeever on January 7, 2003.  Def.'s Eh. 15.  He based his selection on the recommendations of the interview panel and Mr. Sherwood, which he thought constituted a "diverse panel of individuals who . . . represented a good base of experience to render an opinion."  Deposition of Steven Jones ("Jones Dep.") at 29-30.[14]

The work histories of Mr. McKeever and Ms. Hendricks are not disputed.  Mr.

_____

[13]  Ms. Hendricks asserts that Mr. Sherwood's credibility raises a genuine issue of material fact because he testified in this lawsuit in 2005 that he had had no role in the discipline of Mr. McKeever in January 2003 when, in fact, Mr. Sherwood had issued a formal suspension.  *See* Pl.'s Exs. 13, 14 & 16; Sherwood Dep. at 83-86.  This lapse of recollection is immaterial to the selection at issue.  The list of Best Qualified candidates and Mr. Sherwood's recommendation of Mr. McKeever were sent to Mr. Jones on November 7, 2002.  A Notice of Proposed Suspension was issued to Mr. McKeever on December 24, 2002, more than a month later.  Mr. Sherwood signed the suspension letter on January 22, 2003, more than two months after his recommendation that Mr. Jones select Mr. McKeever.

[14]  Ms. Hendricks admits all of these facts but denies their import, arguing that the selection of Mr. McKeever "despite his disqualifying misconduct raises a genuine issue as to Mr. Jones's motives."  Pl.'s Issues at 21.  Mr. Jones testified that Mr. McKeever "admitted to the wrongdoing, he's going to get a couple of days suspension [for it but] that doesn't mean his career is over.  It means that he was punished for it."  Jones Dep. at 33.  The proposed suspension specified that Mr. McKeever had consumed alcohol while carrying his TIGTA-issued firearm. Pl.'s Opp., Ex. 14. The Court can find no support for Ms. Hendricks's argument that the selection of Mr. McKeever under the admitted circumstances raises a question about Mr. Jones's motives.  Mr. Jones made the decision "that the best way to deal with [the] issue, [was] getting that suspension out of the way, before he reported to a new job." Jones Dep. at 33.

McKeever had been a criminal investigator with TIGTA and its predecessor, the IRS Inspection Service, since 1987. Def.'s Facts ¶ 42. He had previously been a police officer with the Washington Metro Transit Authority for approximately four years. *Id.* While a criminal investigator with the Department of Treasury, Mr. McKeever was responsible for initiating, planning and conducting investigations of alleged misconduct and criminal violations, executing search and arrest warrants, preparing reports, and testifying at trials and administrative hearings. *Id.* He was involved in multi-agency and international investigations involving bribery and conflict of interest allegations as well as a wide variety of offenses including impersonation, unauthorized disclosure, false statements, corrupt interference, threats and assaults, theft, computer fraud, and drug offenses. *Id.* He received performance awards in 1996, 1997 and 2002, a Manager's Award in 1996, and a Special Act award in 1998. *Id.* Mr. McKeever submitted a performance appraisal dated October 4, 2001, with his application. *Id.* ¶ 43. In TIGTA's pass/fail performance system, Mr. McKeever received a pass evaluation in each of the three critical elements for both mid-year and year-end reviews. *Id.*

Ms. Hendricks's application included her most recent performance appraisal as well. It showed that she had received a pass rating for all critical elements for both the mid-year and year-end reviews. *Id.* ¶ 45. Ms. Hendricks's application package demonstrated that she had conducted a variety of investigations and also held the RTSO and TSO collateral responsibilities until 2000.[15]

---

[15] Ms. Hendricks performed the collateral duties of RTSO until September 2000, when she advised her supervisor, Mr. Camus, that she no longer wished to perform them. Def.'s Facts ¶ 57. Ms. Hendricks states that she "only stopped performing the technical support duties under pressure from SIID management to do so, and because [my] efforts were not being rewarded." Pl.'s Issues at 28.

### 4. 2003 Application for Assistant Special Agent in Charge of the Technical and Forensic Support Division (03-FESB-181)

TIGTA posted Vacancy Announcement 03-FESB-181 for the position of ASAC, GS-14, in the agency's Technical and Forensic Support Division. Def.'s Mem., Ex. 18. Ms. Hendricks applied for the position, located in Landover, Maryland, in April of 2003. SAC ¶ 35. Michael Radetic, a white male, was selected for the position. *Id.*

According to its position description, the duties of this ASAC were to supervise five to eleven special agents and one support person; to manage the group's investigative program and assigned resources; and to review and forward the results of investigations to the Department of Justice, IRS management, or other authorities for action concerning the criminal and administrative findings. *Id.*[16] At the time that Mr. Radetic applied for the job, he was already a GS-14 special agent in SIID. *See* Def.'s Mem., Ex. 19 at 1. Ms. Hendricks was a GS-13 special agent. Def.'s Mem., Ex. 20. No interviews were conducted for this vacancy, and TIGTA was not required to conduct interviews for the position. Def.'s Facts ¶ 48 *see also* Hendricks Dep. 7/7/05 at 84-86.

On April 10, 2003, the Bureau of Public Debt prepared two certificates for this vacancy announcement, one for competitive eligibles (those who were not at the GS-14 level) and one for non-competitive eligibles (those who already held GS-14 jobs). *See* Def.'s Mem., Exs. 22 (Merit Staffing Certificate — Non Competitive Eligibles) & 23 (Merit Staffing Certificate — Competitive Eligibles). Mr. Radetic and two other candidates were on the non-competitive eligibles certificate; Ms. Hendricks and one other candidate were on the competitive eligibles certificate.

---

[16] Ms. Hendricks denies that special agents in the Technical and Forensic Support Division conduct investigations. The description of the ASAC's duties comes from the position description and suggests that these special agents do, at least on occasion, conduct investigations. In any event, this denial is irrelevant to the selection issues.

Def.'s Facts ¶ 51.  Ms. Hendricks acknowledges that the difference between the two lists is that a noncompetitive candidate could be selected for an in-grade transfer without consideration of the other applicants.  *Id.*; Hendricks Dep. 7/7/05 at 85-86.[17]

The application packages were provided to Michael Doak, SAC of the Technical and Forensic Division, for rating and ranking.  Jones Decl. at 2.  Mr. Doak recommended Mr. Radetic. *Id.* Mr. Jones selected Mr. Radetic based on Mr. Doak's recommendation, his own review of the applications, and discussion with Mr. Doak concerning the non-competitive eligibles.[18]  Mr. Jones

---

[17] Interestingly, Ms. Hendricks denies this last statement in Defendant's Statement of Facts. Pl.'s Issues at 24.  Ms. Hendricks offers that she denies the statement "on the basis that it is not supported by the citation to Ms. Hendricks's deposition." *Id.*  Ms. Hendricks is technically correct, because Defendant's citation is to the wrong day of testimony (Defendant cites to Ms. Hendricks July 11, 2005 deposition), but the page number citation is correct.  Ms. Hendricks's  testimony in deposition on July 7, 2005, (at the pages cited by Defendant) shows that Ms. Hendricks cannot possibly dispute Defendant's statement:

> Q.  Do you know what the difference is between a noncompetitive eligible
> and a competitive eligible?
> A.  It wasn't necessary to compete as a noncompetitive eligible.
> Q.  So a selecting official could just simply pick one of the noncompetitive
> eligibles and put them into the position.
> A.  Correct.
> Q.  Without any consideration of anyone else.
> A.  Correct.
> Q.  And that would have been proper.
> A.  My understanding of the process, yes.

Hendricks Dep. 7/7/05 at 86.  Plaintiff cannot contradict clear answers to unambiguous questions given at deposition for the purpose of creating disputed factual issues and thereby avoid summary judgment.  *See Reetz v. Jackson*, 176 F.R.D. 412, 414-15 (D.D.C. 1997).

[18] Citing to Mr. Jones's declaration, Ms. Hendricks denies that Mr. Jones selected Mr. Radetic based on Mr. Doak's recommendation.  Mr. Jones's declaration states that SAC Doak "recommended the selection of Michael Radetic.  No interviews were conducted.  After discussing the merits of each Non-Competitive Eligible, I agreed with SAC Doak's recommendation and selected Radetic for the position."  Jones Decl. at 2.  Ms. Hendricks's citation does not support her denial or create a genuine issue of material fact.

did not consider either of the candidates on the competitive eligibles list, including Ms. Hendricks.[19]

There is no dispute about Mr. Radetic's background. He is a graduate of Illinois State University with a B.S. in Criminal Justice. Def.'s Facts ¶ 54; Def.'s Mem., Ex. 19. From 1987 to 1998, he worked as a Special Agent for the Office of the Inspector General for the Small Business Administration, where he conducted criminal investigations into loan fraud, contract fraud, bank fraud, theft, embezzlement and various other violations of Titles 15 and 18. *Id.* He became an Internal Security Inspector, GS-13, with the IRS Inspection Service (TIGTA's predecessor agency) in August 1998. *Id.* There, he was responsible for investigations involving contract/procurement fraud, identity theft, child pornography, narcotics violations, and complex financial crimes. *Id.* He has been involved in undercover operations and with multi-agency investigations involving federal, state and local law enforcement agencies. *Id.*

Ms. Hendricks's application notes her experiences as a GS-13 special agent, as a TSO, as an RTSO and an additional special recognition note for her work on a criminal investigation involving child pornography. Def.s Mem., Ex. 20.

---

[19] Ms. Hendricks takes issue with Mr. Jones's declaration to this effect, although she offers no evidence to discount it. She denies that Mr. Jones did not consider her. Pl.'s Issues at 25 ("Deny that Mr. Jones did not consider Ms. Hendricks. Mr. Jones acknowledged that he was not limited to selecting from the noncompetitive list of candidates, and could have selected Ms. Hendricks from the competitive list. That is precisely what he did more than a year earlier in vacancy announcement 02-FSEB-210 when he interviewed candidates from both the noncompetitive and competitive certificates and selected Ronald McKeever from the competitive list even though there was a noncompetitive candidate available. Mr. Jones had knowledge of Ms. Hendricks's qualifications for the position independent of her application.") (citations omitted). Ms. Hendricks's view of the facts fails to appreciate the nature of the selection process. Mr. Jones received a recommendation from Mr. Doak, who had limited his own consideration to those on the non-competitive eligibles list. After discussion and satisfying himself concerning each of the non-competitive eligible candidates, Mr. Jones agreed with the recommendation. While Mr. Jones *could have* gone beyond the non-competitive eligibles list, as he had in the past, he was not required to do so, especially since the person who evaluated the application packages and recommended Mr. Radetic had not done so.

Both Mr. Radetic and Ms. Hendricks had received "pass" evaluations on all critical elements of their positions in their most recent performance appraisals.  Def.'s Facts ¶¶ 55, 56.

### 5.  Hostile Work Environment

Ms. Hendricks complains that she was subjected to a hostile work environment and a series of adverse personnel actions that ultimately led to her constructive discharge.

### a.  Background Investigation

In 1999, the IRS conducted a background investigation to update Ms. Hendricks's security clearance. Hendricks Dep. 7/11/05 at 54.  By memo dated January 5, 2000, Bob Velon, TIGTA's Security Officer, notified Ms. Hendricks that his review of her background investigation disclosed credit issues.  *See* Def.'s Mem., Ex. 31.  According to Mr. Velon, the report indicated that Ms. Hendricks had a poor credit history dating back to 1987; it also included current outstanding balances more than 120 days past due and a late mortgage payment.  *Id.*  Mr. Velon advised Ms. Hendricks that "[t]he frequency and recency of the above information raises a security concern that your payment practices demonstrate a history of not meeting your financial obligations or an unwillingness to satisfy your debts."  *Id.*   Mr. Velon identified two TIGTA policies that were implicated by Ms. Hendricks's financial history and proposed to monitor her credit for one year.  *Id.*  Further, Mr. Velon advised, "Failure to properly meet your financial obligations jeopardizes your position as a Special Agent with TIGTA, and may be grounds for further disciplinary actions, up to and including removal."  *Id.*  Ms. Hendricks signed the memo on January 7, 2000, acknowledging its receipt but noted that "there are some inaccuracies in the memo" and indicated that she would provide a letter regarding them.  *Id.*   Ms. Hendricks does not dispute that she "had some issues paying bills timely."  *See* Hendricks's Dep. 7/11/05 at 56-57 ("Q.  You don't dispute that you had

some issues paying bills timely, do you? A. I was a divorced mother.  I was going through a divorce and – no, I'm not disputing that.").

Following the one year of credit monitoring, Donna Copson, Associate Inspector General for Management Services (at this point in history, TIGTA's personnel function), informed Robert Cortesi, then-Deputy Inspector General for Investigations, that there had been "little improvement in Ms. Hendricks['s] credit" and that "[i]f this pattern continues, Ms. Hendricks is in jeopardy of losing her TOP SECRET eligibility as well as disciplinary action."  *See* Def.'s Mem., Ex. 32.  Ms. Hendricks then met to discuss her credit issues with David Buckley, then-Assistant Inspector General for Investigations, Brian Dwyer, then-SAC for SIID, and Tim Camus, then-ASAC and her first line supervisor.  Def.'s Facts ¶ 79; Hendricks Dep. 7/11/05 at 66.  Mr. Buckley instructed her to take immediate action to prevent her from losing her security clearance.  Hendricks Dep. 7/11/05 at 68.  Mr. Buckley gave Ms. Hendricks two hours a day of administrative time to prepare a response to the January 7, 2000, memo from Mr. Velon. *Id.*

Ms. Hendricks submitted the long-awaited response to Mr. Velon's memo on December 27, 2000, almost twelve months later.  *See* Def.'s Mem. Ex. 33; Hendricks Dep. 7/11/05 at 69-70.  She detailed the nature of the accounts and reported that she had brought them current. *See id.*  Thereafter, Ms. Copson notified Ms. Hendricks that she had satisfactorily addressed her credit issues.  *See* Def.s Mem., Ex. 34; Hendricks Dep. July 11, 2005 at 71.

Ms. Hendricks ties the initial memorandum from Mr. Velon and the monitoring of her credit to the alleged hostile work environment by noting that Mr. Velon and Mr. Dwyer were friends, Pl.'s Issues VI.C, and by asserting that Mr. Velon's treatment of her was inconsistent with his treatment of white male agents who had serious financial problems in their backgrounds.  *Id.* VI

D. She compares herself to Mr. Radetick, who declared personal bankruptcy at an unspecified time in the past but was never questioned about it by the security officers of TIGTA. *See* Deposition of Michael Radetic ("Radetic Dep.") at 59-61.

### b.  Other Personnel Actions

#### 1.  Counseling Memo and Reprimand

On September 15, 2003, Ms. Hendricks received two memos from her first-line supervisor, ASAC Tim Herlihy – one counseling her about performance problems, Pl.'s Opp. Ex. 34, and one charging her with failure to follow supervisory instructions. Pl.'s Opp., Ex. 33. Ms. Hendricks complains that she was thus subjected to "unwarranted discipline" as part of the alleged hostile work environment. *See* SAC ¶¶ 44-49.

The Counseling Memorandum indicated concerns about Ms. Hendricks's performance of Critical Element #2, Conducting Investigations, and Critical Element #3, Execution of Duties. *See* Pl.'s Opp., Ex. 34. Specifically, Mr. Herlihy noted "four cases that are significantly overage" and detailed their status. *Id.* He recommended advanced training and concluded that he "currently consider[ed] your performance to be at the 'pass' level as it relates to the performance plan elements and standards of your position" but that, without improvement, it could become a "fail." *Id.* Mr. Herlihy directed Ms. Hendricks to complete and submit her reports of investigation on the four identified cases by the end of the fiscal year. *Id.*

The Letter of Reprimand from Mr. Herlihy concerned a direct instruction from him that Ms. Hendricks admits she had failed to obey. Pl.'s Opp., Ex. 33. Ms. Hendricks had concluded that one of her investigations had proven certain allegations but, in a meeting with Mr. Herlihy and agency counsel, her supervisor and the lawyers disagreed with her assessment. *See id.* Ms.

Hendricks obtained more information that she wanted to provide to agency counsel but was specifically directed by Mr. Herlihy not to do so. *Id.* Nonetheless, "Ms. Hendricks believed she was obligated to notify TIGTA counsel that she had obtained the information they requested from her, which is what she did. Hendricks Dep. 7/11/05 at 23-25." Pl.'s Opp. at 26. Mr. Herlihy reprimanded Ms. Hendricks for not following his directions:

> I expect you to follow my instructions. Though you thought
> the information should immediately be sent to Counsel for
> review, I told you not to send it, and I expected you to
> comply with my instructions. Your email to Counsel was
> unprofessional and reflected poorly on SIID.

Pl.'s Opp., Exh. 33. Mr. Herlihy noted that Ms. Hendricks's email to counsel acknowledged that he had instructed her not to send the information. *See id.*; *see also* Def.'s Mem., Ex. 29 (April 4, 2003 email (admitting that Mr. Herlihy had said "not to provide additional information to counsel, and to wait and see what opinion counsel rendered" but that "[t]his email is not an attempt to be insubordinate by any means. I just feel that counsel needs the additional information.") Mr. Herlihy's reprimand noted that counsel "indicated that the additional information did not [a]ffect the conclusions reached during this meeting." Pl.'s Opp., Ex. 33.

### 2. Year-End and Mid-Year Evaluations

Mr. Herlihy evaluated Ms. Hendricks's performance in an appraisal dated October 31, 2003. *See* Pl.'s Opp., Ex. 31. She received "pass" on all three critical elements of her position and Mr. Herlihy praised her performance in connection with a variety of investigations. *Id.* At the end of her appraisal, he added:

> I am dedicated to working together in FY-04 to dispose of
> the investigations currently in your inventory; [sic] and
> assist you in pursuing new investigations. I am also

> dedicated to working with you in connection with your
> professional development.    Specifically, attending the
> various training classes involving editing investigative
> reports, advanced investigative techniques, and continuing
> legal education, which were previously identified.

*Id.*  By the next mid-year evaluation, however, Ms. Hendricks's situation was more dire.  In May

2004, Mr. Herlihy issued a mid-year performance appraisal for Ms. Hendricks that rated her as

failing in two out of three critical elements, *i.e.*, Conducting Investigations and Execution of Duties.

*See* Pl.'s Opp., Ex. 32.  Ms. Hendricks was advised that she would soon be put on a performance

improvement plan ("PIP").  Hendricks Dep. 7/ 705 at 222; Herlihy Dep. at 84-85.  In the interim, Ms.

Hendricks had filed an EEO complaint charging Mr. Herlihy with discrimination and retaliation over

the September 15 counseling letter and letter of reprimand.  Pl.'s Issues VI.G.

### 3.  Use of VRS and Leave Restrictions

In February 2004, Ms. Hendricks approached ASAC Tim Herlihy, her direct

supervisor, about a medical ailment that required physical therapy.  Herlihy Dep. at 72-73, 77.  Ms.

Hendricks lives in Baltimore, Maryland, where her therapists were located.  *Id.* at 75.  With Mr.

Herlihy's approval, Ms. Hendricks utilized the agency's virtual resource system ("VRS") program

to telework from Baltimore so that she could schedule her physical therapy appointments without

taking as much leave as might otherwise be required.  *Id.* at 71-73; *see also id.* at 72 ("I agreed to

allow her to VRS, adjust her work schedule and submit leave slips after the fact.").

However, Ms. Hendricks's unavailability resulted in insufficient hours under the Law

Enforcement Availability Pay ("LEAP") program.   LEAP increases a federal law enforcement

officer's salary by 25% of their base pay for working, or being available to work, an average of two

(2) extra hours each day. Hendricks Dep. 7/11/05, at 101. Mr. Herlihy conducted a normal quarterly

review of LEAP hours on April 1, 2004.  Def.'s Facts ¶ 94.  Ms. Hendricks was only averaging 1.5

hours per day, instead of the statutorily required two hours.  *See* Def.'s Mem., Ex. 37.  Accordingly,

on May 5, 2004, Mr. Herlihy issued a LEAP memo to Ms. Hendricks, commenting that it was

particularly disturbing that Ms. Hendricks had not met her LEAP hours because she had failed to

meet the time in the prior year as well and had been directed to increase her LEAP average.  *Id.*; *see*

*also* Herlihy Dep. at 77-78.  Mr. Herlihy identified a plan of action to bring Ms. Hendricks current

in her LEAP hours, including that she could no longer work at home under the VRS telecommuting

program, that she would increase her hours and achieve a 2.0 average by June 20, 2004, and that she

would maintain a 2.0 average for the remainder of the year.  Def.'s Mem. Ex. 37.

   This action plan was not successful and Ms. Hendricks averaged only 1.7 hours in

the next quarter, instead of 2.0.  *See* Def.'s Mem., Ex. 38.  She received another LEAP memo on July

29, 2004.  *Id.*; Hendricks Dep. 7/11/05 at 118.

   Ms. Hendricks alleges that her removal from VRS was discriminatory "because

everyone else in the office was allowed to work from home."  *Id.* at 121.  She recognizes that, under

the rules governing the VRS program, employees must meet all of their employment requirements,

that TIGTA unilaterally reserved the right to cancel VRS participation, that a decline in performance

is one ground for removal from VRS participation under the VRS rules, and that VRS is not an

"employee benefit."  *Id.* at 122-124.  However, she does not admit that she was removed from the

VRS program due to her admitted failure to meet the LEAP requirements.  "Participating in the

agency's VRS telework program required Ms. Hendricks to use less leave to obtain needed medical

treatment, and therefore helped her meet her LEAP requirements."  Pl.'s Issues at 46.[20]

Prior to leaving his employment with TIGTA, Mr. Herlihy contacted the Bureau of Public Debt concerning Ms. Hendricks's usage of unscheduled annual leave and sick leave.  Def.'s Facts ¶ 97.  Mr. Herlihy had intended to issue a leave restriction memorandum to Ms. Hendricks but left TIGTA before it was drafted.  *Id.*  Therefore, John Phillips, acting ASAC, issued a leave restriction memo to Ms. Hendricks on June 24, 2004. *Id.*; *see* Def.'s Mem., Ex. 39.  Her record showed that Ms. Hendricks had used 138 hours of illness-related leave in a ten-pay-period span on 26 different days, including a full eight hours of leave on 13 of those days.  Def.'s Facts ¶ 98.  She had also used 48 hours of unscheduled annual leave without obtaining prior approval in accordance with TIGTA policy.  *Id.*  The memorandum placed restrictions on Ms. Hendricks's use of unscheduled annual leave, requiring her to produce acceptable evidence of the need to take unscheduled leave without prior approval.  Def.'s Mem., Ex. 39.  In addition, Ms. Hendricks was required to submit an acceptable medical certificate for any sick leave for illness-related reasons. *Id.*  Ms. Hendricks was informed that her failure to comply would result in her being charged absent without leave ("AWOL"). *Id.*

On July 6, 7, 8, and 9, 2004, Ms. Hendricks left voicemail messages with ASAC Phillips advising him that she was taking sick leave for each day.  Declaration of John Phillips ("Phillips Decl.") ¶ 14.  In accordance with her restricted-leave status, she was initially charged

---

[20]  When Mr. Herlihy gave the LEAP memo to Ms. Hendricks, he did not know that she was still in physical therapy, which had started in February.  Herlihy Dep. at 77.  There is no indication that Ms. Hendricks told him at that time that she was still seeing a physical therapist.  She did not apply for a waiver from the LEAP requirements, which she might have done. *See* Def.'s Mem., Ex. 38 (citing Operations Manual (400) — 40.3.3 allowing for an employee to apply for a temporary exemption from certification if necessary due to a hardship).

AWOL until she brought in adequate medical certificates to substantiate her need for sick leave.  *See* Pl.'s Issus at 49 ("She was initially charged AWOL, and had to bring multiple doctors' letters to her supervisors to have the time changed to [leave without pay] LWOP status.").

### 4.  Failure to Select for Acting Positions

As part of the alleged hostile work environment, Ms. Hendricks also alleges that she was not selected for "career-enhancing acting positions," awarded to others outside her protected class and/or who had not engaged in protected activities.  *See* SAC ¶¶ 50-55.  She does admit that in November-December 2001, when Mr. Camus was her direct supervisor, reporting to Mr. Dwyer, both men arranged for Ms. Hendricks to receive a 30-day Acting ASAC detail to the Baltimore Field Office.  Hendricks Dep. July 11, 2005 at 42-43 ("Mr. Camus and Mr. Dwyer suggested that I may be interesting in acting in Baltimore because there was going to be an acting assignment in Baltimore.").  When Ms. Colonna was her direct supervisor, Ms. Colonna asked Ms. Hendricks if Ms. Hendricks wanted to be considered for an acting position as ASAC of Technical Support Services because she had experience as a tech agent.  *Id.* at 50-51.  Ms. Hendricks declined the opportunity to be considered for this acting position because she wanted to focus on her SIID investigations.  *Id.* at 51. This was the same acting position that Mr. Radetic held for a while and that supported his application for the job.  *Id.*  Mr. Herlihy supervised Ms. Hendricks during the year that she "was taking sick leave to get therapy for an injury to her foot," Pl.'s Issues at 48, and when he issued a counseling memo and a letter of reprimand.  Mr. Herlihy did not select Ms. Hendricks for acting positions because he felt she needed to focus on completing her overdue investigations.  Herlihy Decl. ¶ 4.

### 5.  Removal of Collateral TSO Duties

In April 2000, James Rice, the Plaintiff's supervisor at the time, created a list of collateral duties that appeared to reassign Ms. Hendricks's technical support collateral duties to a new agent in the office.  Def.'s Facts ¶ 57.  However, Ms. Hendricks continued performing her collateral duties until September 2000, when she advised Mr. Camus that she no longer wanted to perform these duties after seven years.  Pl.'s Dep. 7/7/05 at 142-145.  The alleged reassignment in April  had no effect on Ms. Hendricks's wages, benefits, or job performance evaluation.  *Id*. at 148-149.

### 6.  **Constructive Discharge**

None of the facts immediately surrounding Ms. Hendricks's resignation is in dispute. In early July 2004, Acting ASAC Phillips assigned a new complaint to Ms. Hendricks that needed an initial investigation.  Def.'s Facts ¶ 100.  Due to the target of the complaint, it was deemed to be a sensitive and high-profile matter.  *Id.*  Under SIID and TIGTA policy, the complaint needed to be investigated within 30 days, or by August 8, 2004.  *Id.*  Acting ASAC Phillips had also received special direction from the Acting SAC that the complaint had to be resolved within the appropriate timeframe.  *Id.*  Ms. Hendricks was aware of this deadline.  *Id.*

On August 3, 2004, Acting ASAC Phillips met with the SAC and then told Ms. Hendricks that she needed to complete her investigation on that day.  *Id.* ¶ 101.  Ms. Hendricks advised him that she still needed to interview one additional person, who would not be available until the next day, August 4, 2004.  *Id.*  Ms. Hendricks called in sick on August 4 and did not conduct the interview.  *Id.*  She completed the interview in the morning on August 5 and then called in sick for the remainder of the day.  *Id.*  She told Mr. Phillips that she would work on her

-26-

memorandum of interview on August 6, 2004, after she concluded some previously-scheduled rifle range training. *Id.* Mr. Phillips left Ms. Hendricks a voicemail instructing her to report to the office on August 6, 2004, and not to attend rifle training at the range, so that she could complete the investigation. *Id.* On August 6, rather than report to the office as ordered, Ms. Hendricks went to the rifle range and submitted her resignation. *Id.* ¶ 102. Ms. Hendricks admits all of these facts and adds, "[b]y way of further response, [she] was suffering from serious health problems in the summer of 2004." *Id.* ¶ 101.

Ms. Hendricks states that she was suffering from acute bronchitis and learned that she had an enlarged heart chamber in July 2004. Pl.'s Issues VII.A. "Her treating mental health professional advised her that she should take extended sick leave . . . ." *Id.* VII.B. Because Ms. Hendricks had no leave available and was already on leave restrictions, she could not take this advice. *Id.* "[H]er therapist advised her to resign from the agency [in] order to protect her health." *Id.* "For all of these reasons, and those that created the hostile work environment, Ms. Hendricks believed she had no choice but to resign from the agency." *Id.* VII.C.

## II.  LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party who "after adequate time

for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B. Discrimination Claims Under Title VII

Generally, to prevail on a claim of discrimination under Title VII, a plaintiff must follow a three-part burden-shifting analysis generally known as the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). The Supreme Court has explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate non-discriminatory reason for the employee's rejection" . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . . The ultimate burden of persuading the trier of

> fact that the defendant intentionally discriminated against the plaintiff
> remains at all time with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (quoting *McDonnell Douglas*, 411 U.S. at 802).  To establish a prima facie case of discrimination under Title VII, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003).

"The burden of establishing a prima facie case . . . is not onerous."  *Burdine*, 450 U.S. at 253.  If a plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee.  *Id*. at 254.  To rebut this presumption, the employer must articulate a legitimate, nondiscriminatory reason for its action.  *Id.*  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  *Id*.  Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappears, and the sole remaining issue is discrimination *vel non*."  *Lathram*, 336 F.3d at 1088 (internal citations omitted).  At this point, to survive summary judgment, a plaintiff "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason." *Id.* (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (*en banc*)). The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka*, 156 F.3d at 1289). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. *Aka*, 156 F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case. *Id.* at 1291.

### C. Retaliation Claims Under Title VII[21]

Title VII provides, in part, that it is unlawful for an employer to discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Title VII's anti-retaliation provision seeks to prevent an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2413 (2006).

---

[21] On June 28, 2006, Ms. Hendricks filed a motion for leave to file a second amended complaint to comport her retaliation claim to the decision of the United States Supreme Court in *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006), and the decision of the Court of Appeals for the District of Columbia Circuit in *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006). This Court granted the motion on August 25, 2006 and ordered that, if the Defendant renewed his motion for summary judgment, he "analyze the applicability" of *Burlington Northern* and *Rochon* to Ms. Hendricks's claim. The Defendant renewed his motion for summary judgment addressing the changes in the legal standard for evaluating retaliation claims. *See* [Dkt. #51]. Ms. Hendricks likewise filed her Opposition incorporating the new retaliation standard articulated by the Supreme Court. *See* [Dkt. #52].

A plaintiff establishes a prima facie case of retaliation or reprisal by demonstrating that (1) she engaged in protected behavior; (2) the employer took an action against plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) there is a causal link between the adverse action and the protected activity. *Rochon v. Gonzales*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006). The Supreme Court recently clarified that Title VII's anti-retaliation provision pertains only to those employer actions that are materially adverse to a reasonable employee or applicant. *Burlington*, 126 S. Ct. at 2415. Therefore, a plaintiff must demonstrate a "materially adverse consequence . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm" which would have dissuaded a reasonable employee from making or supporting a charge of discrimination. *Rochon,* 438 F.3d at 1219 (citing *Brown*, 199 F.3d at 457).

If a plaintiff can establish a prima facie case of retaliation, the analysis then follows that for a discrimination claim, *i.e.*, the defendant must provide a legitimate, non-discriminatory reason for its actions and the plaintiff then has the burden of proving by a preponderance of the evidence that the defendant's actions were taken for reasons other than those offered, and instead, for a retaliatory purpose. *See Welzel v. Bernstein*, 436 F. Supp. 2d 110, 115 (D.D.C. 2006) (applying the *McDonnell Douglas* burden shifting to retaliation claims post *Burlington Northern* and *Rochon*). If a plaintiff cannot establish that the defendant's legitimate, non-discriminatory reason is pretext for discrimination, however, the defendant is entitled to summary judgment and plaintiff's claims fail as a matter of law. *Welzel*, 436 F. Supp. at 116.

### D.  Discrimination Claims Based on Hostile Work Environment

Title VII prohibits an employer from discriminating against any individual with

respect to compensation, terms, conditions or privileges of employment because of race, color, religion, sex, or national origin. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Toward that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Such an environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Singletary v. Dist. of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003) (quoting *Meritor*, 477 U.S. at 65, 67). On the other hand, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Thus, to determine whether a hostile work environment exists, courts look to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interfered with an employee's work performance. *Id*. at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). In considering the totality of the circumstances, however, the court is mindful that:

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)).

To establish a prima facie case of hostile work environment, a plaintiff must show

that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it. *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003); *Crenshaw v. Georgetown Univ.*, 23 F. Supp. 2d 11, 15 (D.D.C. 1998); *Jones v. Billington*, 12 F. Supp. 2d 1, 11 (D.D.C. 1997).   Finally, although there is authority that the *McDonnell Douglas* framework does not apply to hostile work environment claims, the law of this Circuit provides for the application of the *McDonnell Douglas* framework to hostile work environment claims. *Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing *Duren v. Wash. Metro. Area Transit Auth.*, 2004 WL 2857273 *1 (D.C. Cir. 2004) and *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)).

## III.  ANALYSIS

Unhappy events certainly affected Ms. Hendricks's last years with TIGTA – she was not promoted, she was reprimanded, she was critiqued for slow performance – but there is no evidence that ties these events to her race or gender or retaliation.  While Treasury concedes that she presents a prima facie[22] case of race and/or gender discrimination, and/or retaliation, in regards to each of the promotions at issue, she fails to demonstrate pretext to overcome TIGTA's legitimate non-discriminatory explanations for its selections.  Her hostile environment claim is based on a series of negative events that happened in her worklife but she presents absolutely no evidence tying any of these events to her race, gender, or protected EEO activity.  The Court finds that even if Ms.

---

[22]  Defendant does not challenge Ms. Hendricks's ability to establish a prima facie case of discrimination or retaliation. *See* Def.'s Mem. at 9.

Hendricks presented a prima facie case of a hostile work environment, she failed to show that Defendant's legitimate, non-discriminatory reasons for its actions are pretextual.  Finally, Ms. Hendricks resigned at a time when she was under great stress but there is no evidence that ties this stress to unlawful discrimination in her workplace.  The complaint will be dismissed.

### A.  Selection of Robert Johnson

Ms. Hendricks argues that the selection of Robert Johnson was discriminatory because he had not presented his application in the proper format, while she did; he had two prior instances of discipline for misconduct, while she had none; and he had worked in the Baltimore field office doing inferior work to the kinds of high-profile and sensitive investigations she had conducted in SIID.  *See* SAC ¶¶ 39-42.  These factors represent a difference of opinion as to the importance of these points but do not evidence discrimination.

Certainly, Ms. Hendricks is an African American female who applied for the position and was qualified for it.  Certainly, a Caucasian male was selected and not her.  She has clearly made out a prima facie case of discrimination on account of her race and gender.  TIGTA, however, has come forward with legitimate, nondiscriminatory reasons for its selection of Mr. Johnson.  Mr. Johnson had a superior performance appraisal, a varied and extensive history of investigations for many more years than Ms. Hendricks, and scored higher than Ms. Hendricks on Mr. Camus's rating and ranking chart.  In response, Ms. Hendricks argues pretext. She discounts the performance appraisal and Mr. Johnson's history of investigations because Mr. Johnson worked in the Baltimore field office and she believes that SIID in headquarters handles more complex, sensitive and high-profile cases than anything that is done in the field offices.  Even more, she emphasizes her unblemished record and Mr Johnson's two instances of discipline, which she asserts disqualify him

from a position in SIID that requires the highest integrity.  Finally, she questions the motives of Mr. Camus, the recommending official, and Mr. Dwyer, the selecting official.

Ms. Hendricks may not establish pretext unless she shows that TIGTA's legitimate, non-discriminatory reasons for selecting Mr. Johnson are false and that discrimination based on her race or gender motivated the actions.  *See* 42 U.S.C. § 2000e-2(m); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-516 (1993).  "Once the employer has articulated a non-discriminatory explanation for its action, the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."  *Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  Even when a job applicant "was victimized by [] poor selection procedures," the court may not "second-guess an employer's personnel decision absent demonstrably discriminative motive."  *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982).

Ms. Hendricks relies on Mr. Johnson's prior misconduct and Mr. Camus's ranking Mr. Johnson higher based on a standard form OF-612, which she alleges was not tailored to the individual KSAs for the position.  Regarding the first issue, Brian Dwyer, the selecting official, testified that he did not view Mr. Johnson's prior issues as disqualifying him for promotion.  The issue was raised with the Assistant Inspector General for Investigations and it was decided that the past misconduct did not pose a problem for the selection.  Camus Dep. at 65.  Further, as explained by Steven Jones, Deputy Inspector General for Investigations of TIGTA, there is difference between someone violating a rule and being disciplined, and someone having "integrity" problems.  Jones Dep. at 13-16.  With respect to the second issue, the OF-612 and other documents included with Mr. Johnson's application materials, Mr. Johnson's application materials demonstrated a more than

reasonable basis for his selection.  Mr. Johnson's appraisal indicated that his

> written products are meticulously prepared. They are clear, complete,
> concise.  He submits his work timely and with no need for
> corrections. His reports of investigation always identify all of the
> issues being examined and they are prepared in a manner that allows
> a reader to quickly and easily understand the entire scope of the
> investigation.  Mr. Johnson has few equals when it comes to
> preparing quality reports.

To survive a motion for summary judgment in a non-selection case when the

employer has articulated a legitimate, non-discriminatory reason for the non-selection, a plaintiff

must prove that she was "significantly" or "markedly" better qualified than the successful candidate.

*See Lathram v. Snow*, 336 F.3d 1085, 1091-92 (D.C. Cir. 2003).   The record demonstrates that Mr.

Johnson had some disciplinary issues in his past, but it also demonstrates that Mr. Johnson was a

highly qualified applicant with a long history of investigative experience.  Moreover, Plaintiff's

argument concerning her superior qualifications, based solely on the fact that she had "been a Special

Agent in SIID headquarters for several years, while Mr. Johnson had been located in the Baltimore

field office" is based on her own assessment of her qualifications, which is a subjective judgment

that does not prove its point.  *See Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C.

2000) (stating that pretext is not shown "simply based on [plaintiff's] own subjective assessment of

[her] own performance"), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002).  The Court cannot second-guess the

recommending and selection officials' evaluation of the application packages.  *See Milton*, 696 F.2d

at 100.  Ms. Hendricks's discrimination claim as to her non-selection for vacancy announcement TG-

2011 fails as a matter of law.

### B.  Selection of Ronald McKeever

Ms. Hendricks argues that the selection of Ronald McKeever was discriminatory and retaliatory because he had a prior instance of misconduct, while she had none; and she had received a commendation from the Department of Justice for her outstanding work on an investigation involving a high-profile child pornography case, while he had not.  Pl.'s Issues at 54-56.  Defendant points to the assessment of the rating panel that interviewed all candidates and unanimously recommended that Mr. McKeever was the best qualified for the position.  *See* Def.'s Mem. at 19-21. Again, Ms. Hendricks must demonstrate that her qualifications were "significantly" or "markedly" better than those of Mr. McKeever.  *Lathram*, 336 F.3d at 1091-92.  As with the selection of Mr. Johnson, Ms. Hendricks does not challenge the selecting official's decision based on the merits of the candidates' qualifications, or the merits of the interview panel's recommendations, but rather points to Mr. McKeever's prior disciplinary action.

On this selection, candidates who made either Best Qualified list were interviewed by a panel consisting of ASAC Drayton (African American female), ASAC Tim Upham (Caucasian male) and Special Agent Dwaine Brinson (African American male).  Def.'s Facts ¶ 35. The interviews were crucial to the interview panel's recommendation. After the interview panel considered each applicant's experience, they unanimously decided to recommend Mr. McKeever to Mr. Sherwood, then Special Agent in Charge.  Drayton Decl. ¶ 29.  Mr . Sherwood recommended that Steve Jones, then-Assistant Inspector General for Investigations, select Mr. McKeever for the position.  Sherwood Dep. at 60-61.  Mr. Jones selected Mr. McKeever based on the panel's unanimous recommendation and Mr. Sherwood's recommendation. Jones Dep. 29-30  Mr. Jones

was aware of Mr. McKeever's prior disciplinary action and it factored into his decision to select him. Specifically, Mr. Jones noted that the discipline was "disappointing, but not fatal . . . he admitted to the wrongdoing, he's going to get a couple of days suspension." *See* Jones Dep. at 32-33.

While the disciplinary action against Mr. McKeever is one distinguishing factor between Ms. Hendricks's application and Mr. McKeever's, she has not carried her burden of showing that Defendant's proffered non-discriminatory reason is pretext.  Most telling in this particular instance of non-selection is that a panel consisting of two African American interviewers and one Caucasian interviewer came to a unanimous decision regarding Mr. McKeever's selection. Specifically, Ms. Drayton concluded that Mr. McKeever was the best candidate for the vacancy because he had "worked more complex and/or more involved cases and was more qualified for the position than the plaintiff."   Drayton Decl. ¶ 29.   Additionally, Mr. Brinson stated that Mr. McKeever answered the panel's questions "very clearly, very concisely" and explained very well the variety of cases he had worked on and the techniques he had used.  Brinson Dep. at 34-35. The record shows that Mr. McKeever had a long resume of criminal investigation experience, and had been involved in several multi-agency and international investigations since the beginning of his service in 1987, and had received several performance rewards in his career. *See* Def.'s Ex. 16. Thus, on this claim, Ms. Hendricks has pointed to no evidence that establishes a discriminatory motive for her non-selection, nor does she proffer sufficient evidence from which a reasonable jury could conclude that Defendant's explanation for its action was a pretext for discrimination.  Ms. Hendricks's discrimination and retaliation claims fail as a matter of law with respect to her non-selection for vacancy announcement 02-FESB-210.

### C.  Selection of Michael Radetic

Ms. Hendricks argues that the selection of Michael Radetic was discriminatory and retaliatory because Mr. Jones selected Mr. Radetic, in part, "as a result of his prior experience as a Technical Support Officer (TSO)" and only Ms. Hendricks had been a TSO and RTSO, not Mr. Radetic.  *See* Pl.'s Issues at 56.[23]  In addition, Ms. Hendricks argues that Mr. Jones concedes that prior experience as a TSO or RTSO would be an advantage, *id.* III.F; every other ASAC for the Technical and Forensic Support Division had served as a TSO or RTSO prior to selection, *id.* III.G; the recommending official, Mr. Doak, and the selecting official, Mr. Jones, knew of Ms. Hendricks's years of experience, *id.* III.H; and Mr. Jones had not before limited his selection to the non-competitive list and knew that he could select Ms. Hendricks from the competitive list.  *Id.* III.I.

The operative fact here is that Ms. Hendricks's application was never considered.  On April 23, 2003, Steve Jones, then Assistant Inspector General for Investigations, selected Michael Radetic for the GS-14 Assistant Special Agent in Charge of the Technical and Forensic Support Division.  Mr. Jones selected Mr. Radetic from the Non-Competitive Eligibles Certification, as Mr. Radetic was already a GS-14.  Ms. Hendricks was on the Competitive Eligible List, as she was designated a GS-13 at the time.  Def.'s Ex. 23.  Plaintiff concedes that it was not improper for Mr. Jones to select a candidate from the non-competitive eligible list without consideration of competitive eligible applicants.  Hendricks Dep. 7/7/05 at 86.  This is exactly what Mr. Jones did on this occasion.  While Mr. Jones may have been aware that Ms. Hendricks served as an RTSO, that

---

[23]  Mr. Radetic testified that he was never a designated technical support officer "but throughout my entire law enforcement career, I worked very, very closely with the technical agents and technical personnel on their technical assignments.  I've wired up warehouses.  I've installed video cameras.  I'm familiar with the technology.  I still like to go and get my hands dirty."  *See* Def.'s Mem., Radetic Dep. at 41-42.

he was not limited to selecting from the noncompetitive list of candidates, the evidence shows, and Ms. Hendricks's own admissions demonstrate, that these facts are not material. Ms. Hendricks must carry her burden of showing that she was significantly more qualified for the position to demonstrate that Defendant's non-discriminatory reason is pretext.

Regardless of Ms. Hendricks's experience as a Regional Technical Support Officer, she has not shown that she was "significantly" more qualified than Mr. Radetic. Mr. Radetic's GS-14 designation aside, he has experience in the technical field, *supra* note 23, has lost of experience in the firearms field, and has served as the Acting Assistant Special Agent in Charge of TFSD.[24] Ms. Hendricks acknowledges that in addition to technical support, a large part of the duties of ASAC of TFSD involves maintaining TIGTA's National Firearms Program. Pl.'s Opp. at 19. Mr. Radetic has extensive experience in this area. Specifically, while in SIID and its predecessor, Mr. Radetic served as the Headquarters Divisional Firearms Coordinartor, as a firearms instructor, attended Firearms Instructor training and Law Enforcement Rifle Training, and assisted the National and Division Firearms Coordinators in the inspection firearms program. Def.'s Mem., Ex. 19. While a Special Agent with the Small Business Administration Office of the Inspector General, Mr. Radetic served as the National Division Firearms Coordinator which provided him with additional experience with firearms. *Id*. In light of the foregoing undisputed facts, Ms. Hendricks cannot show that she was

_____

[24] Ms. Hendricks points out that Mr. Radetic was detailed into the acting assignment for ASAC for TFSD shortly before his permanent selection to that position. *See* Pl.'s Opp. at 22. She argues that this was to "boost his otherwise inferior qualifications." *Id*. Although Ms. Hendricks states that Mr. Radetic was provided the acting ASAC assignment solely to bolster his credentials for the ASAC position, her supervisor at that time, Jackie Colonna, asked Ms. Hendricks if she wanted to be considered for this acting ASAC position. *See* Hendricks Dep. 7/11/05 at 50-51. Ms. Hendricks declined to be considered because she wanted to focus on meeting deadlines in her case inventory. *Id*. Having declined to be considered, Ms. Hendricks cannot complain that the person who held the "acting" position got credit for successful performance.

"significantly" or "markedly" better qualified than Mr. Radetic.  *See Lathram*, 336 F.3d at 1091-92.

Ms. Hendricks's claim for discrimination and retaliation based on her non-selection for vacancy

announcement 03-FESB-01 will be denied.

### D.  Selection of Steven Geary

On December 20, 2001, Special Agent in Charge of SIID selected Steven Geary to

a Non-Supervisory Criminal Investigator GS-14 position.  On this occasion, a panel of three ASACs

within SIID acted as the rating panel.  Def.'s Facts ¶ 14.  The panel included Jim Rice (Caucasian

male), Tim Camus (Caucasian male), and Dedra Drayton (African American female). *Id.*  Using the

same four criteria as on the selection for Vacancy Announcement TG2011, the panel members

prepared worksheets for each application reviewed and scored each applicant accordingly.  Def.'s

Facts ¶ 16. Once the rating and ranking panel evaluated and ranked the application packages of all

candidates, their scores were forwarded to the TIGTA personnel function.  Pl.'s Issues at 12.  Based

on the scores of the rating and ranking panel, a personnel specialist compiled a best qualified list that

included Mr. Geary and Ms. Hendricks, along with other candidates.  *Id.*  Once personnel developed

a best qualified list, Mr. Drayton, Mr. Camus, and Mr. Rice interviewed all candidates on the best

qualified list, including Mr. Geary and Ms. Hendricks.  *Id.*  Following the interviews of all

candidates, the panel unanimously recommended that Mr. Geary, and others not at issue in this

litigation, be selected as the best qualified persons for two open GS-14 positions.  Def.'s Facts ¶ 23.

Ms. Hendricks argues that the selection of Mr. Geary was discriminatory and

retaliatory because Ms. Drayton raised his score on one rating criterion even though her written

comments on Mr. Geary and Ms. Hendricks were nearly identical, *id.*, IV.B & C; because Mr. Geary

"barely discussed any cases he worked, let alone complex ones" in his application package, and Ms.

Hendricks had given numerous examples, as recognized by Interview Panel member Rice, *id.* IV.E; that Ms. Hendricks performed well in the interview process and nothing indicates that Mr. Geary performed better than she, *id.* IV.F; that Mr. Geary's application package and scores were forwarded to Mr. Dwyer for consideration but hers were not, *id.* IV.G; and that Mr. Dwyer selected Mr. Geary over Kent Jefferies, who was another candidate and who had scored higher than Mr. Geary.  *Id.*

Ms. Hendricks's claim is unusual in that it challenges, in part, the process that was used to develop the best qualified list, not to make the selection at issue, notwithstanding that Ms. Hendricks made the best qualified list.  In fact, Ms. Hendricks's reliance on the scoring of the written applications by the Rating and Ranking Panel is irrelevant; the scores given by the Rating and Ranking Panel were used by TIGTA personnel to generate a "best qualified list," not to make the ultimate selection.  *See* Dwyer Decl. 6/3/02 ¶ 4.  As explained by Ms. Drayton, who was a member of the Rating and Ranking panel, "[a]fter the panel members had completed their individual review and rating of the application packages, the Worksheets containing each panel member's ratings of the written application were returned to TIGTA's personnel function, which was responsible for generating a Merit Staffing Certificate." Drayton Decl. ¶ 15.

Following the interview of each candidate on the Best Qualified List, including Ms. Hendricks, the interview panel recommended three people as best qualified for the two GS-14 positions — Joanne Jensen, Kent Jefferies, and Steven Geary.  It is undisputed that these recommendation were unanimous and did not include Ms. Hendricks.  Def.'s Facts ¶ 21; Def.'s Mem., Ex. 10.  The record indicates that Ms. Hendricks performed well in the interview and Defendant does not contest this fact.  *See* Pl.'s Opp., Ex. 25, Def.'s Reply in Supp. of Mot. for Summ. J.(Def.'s Reply") [Dkt. #42] at 20.  Ms. Hendricks states that "[n]othing in the panel's notes

from Mr. Geary's interview suggest that he performed better than Ms. Hendricks;" she therefore

asserts that she deserved the selection more than Mr. Geary.  *See* Pl.'s Issues at 13; Pl.'s Opp. at 42.

A "plaintiff cannot establish pretext simply based on her own subjective assessment of her own

performance, for plaintiff's perception of herself, and of her work performance, is not relevant."

*Waterhouse*, 124 F. Supp. 2d at 7; *Valles-Hall v. Ctr. for Nonprofit Advancement*, 481 F. Supp. 2d

118, 149 (D.D.C. 2007).  According to Mr. Camus, "[a]lthough Ms. Hendricks had a good interview,

in my opinion, the selectees' interviews were better."  Camus Decl. 5/3/02 ¶ 5.  In addition, Ms.

Drayton indicated that the selectees "had more relevant and more overall experience to do the job

than the Plaintiff."  Drayton Decl. ¶ 20.

Ms. Hendricks has failed to show that her qualifications were "significantly" or

"markedly" better than those of Mr. Geary.  *Lathram*, 336 F.3d 1091-92; *Aka*, 157 F.3d at 1294.

Prior to becoming a criminal investigator, Mr. Geary served as a police officer for approximately

four years, where he was responsible for interviewing witnesses, performing patrol duties, testifying

in court, preparing incident reports, analyzing data, and serving and executing arrest and search

warrants.  Def.s Mem., Ex. 12.  Mr. Geary was a criminal investigator from 1989 to 1999, when he

began working with the IRS Inspection Service which became TIGA.  *Id.*  During his employment

with IRS TIGTA, Mr. Geary was responsible for planning, coordinating, and conducting highly

sensitive internal investigations involving TIGTA employees as well as high-level IRS employees.

*Id*. at 10-15.  Mr. Geary is also a graduate of Temple University, where he received a B.A. in

criminal justice.  *Id*. at 3. Defendant has met its burden of articulating a non-discriminatory reason

for not selecting Ms. Hendricks.  Ultimately, Ms. Hendricks's claims of discriminatory and

retaliatory non-selection rely on the sheer number of positions for which she applied but was

rejected. Although several non-selections may be disheartening for her, each selection must be analyzed on the basis of the specific application. *See Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298 (D.D.C. 2005). Ms. Hendricks must offer evidence that tends to show that Defendant's justifications were pretextual, or at least that there is a genuine dispute of material facts. That she has not done.

### E. Hostile Work Environment

Ms. Hendricks is a member of a protected class — African American female. Ms. Hendricks provides a litany of circumstances she considers to evidence harassment: unjustly criticizing her in performance reviews for being slow to close cases; conducting an "unwarranted" background investigation into her alleged credit problems; causing her to keep cases open longer than necessary through poor managerial direction; micromanaging her time and treating her like a new agent; threatening to give her a failing performance rating; not appointing her for acting supervisory positions; revoking her ability to work from home; issuing her "unwarranted" discipline; maligning her personal and professional reputation; inappropriately maintaining inaccurate documents about her security clearance in her personnel file; and attempting to remove her collateral duties as Technical Support Officer. *See* SAC ¶¶ 44-84. She claims that the aforementioned actions by TIGTA management created a hostile work environment on the basis of her sex and race, and her participation in protected activity. Ms. Hendricks argues that TIGTA's conduct, including the credit-related background investigation, "harmed her professional reputation and standing in the agency at a time when she was applying for several promotional positions." *See* Pl.'s Opp. at 25 n. 5. Although not stated expressly, Ms. Hendricks intimates that Agency managers should have known that this behavior was improper and did nothing to prevent it. Although the Court is dubious as to

whether Ms. Hendricks's Complaint makes out a prima facie case of a hostile work environment, the claims must be denied because there is no evidence to support her allegations that her working environment was permeated with "discriminatory intimidation, ridicule, and insult." *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002). Further, Defendant has proffered legitimate, non-discriminatory reasons for each of its actions.

Title VII prohibits an employer from discriminating against any employee with respect to compensation, terms, conditions or privileges of employment because of race, color, religion, sex, or national origin. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Toward that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Such an environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Singletary v. Dist. of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003) (quoting *Meritor*, 477 U.S. at 65, 67). On the other hand, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

Ms. Hendricks's own concessions at deposition conclusively establish that she cannot meet the standard of proof required for a hostile work environment claim. When asked whether anyone in her workplace had made "any disparaging comments to [her] about [her] race," Ms. Hendrick's responded that "not that I recall." Hendricks Dep. 7/11/05 at 185. Similarly, when asked if she had ever heard of others making derogatory racial comments, Ms. Hendricks responded,

"Specifically, I can't — I don't recall."[25]  *Id*.  When asked whether or not anyone in the workplace

ever made disparaging remarks to Ms. Hendricks about her gender, she could not recall any, instead

referencing a positive comment made to her by Mr. Radetic about her performance in an interview.

On that occasion, Mr. Radetic commented that he understood why TIGTA suggested that female

agents go with male agents on interviews.   Mr. Radetic was interviewing a female, and Ms.

Hendricks made the interview better.  *Id*. at 185-86.  Ms. Hendricks could not recall any instances

of "disparaging" remarks made to her personally about females in the office.  *Id.* at 189.

        Ms. Hendricks did, however, recall overhearing one agent say to another that he was

"just dicking around."   *Id*. at 189.  She also recalled overhearing Mr. Dwyer state to another

individual that he was "going to meet with the big dicks" as he was leaving the office for a meeting.

*Id*. at 190.  After hearing these comments, which took place on the same day in 2002, plaintiff

complained to her supervisor, Mr. Camus.  *Id*.  According to Ms. Hendricks, Mr. Camus appeared

shocked when she told him what she had overheard, and he told Ms. Hendricks that he would say

something to Mr. Dwyer.  *Id*. The next day it was apparent to Ms. Hendricks that Mr. Camus had in

fact spoken to Mr. Dwyer regarding his language — Ms Hendricks overheard Mr. Dwyer state, "I

have to watch what I say because I can offend people in this office."  *Id*.at 191.  Other than the two

comments made on a single day in 2002, Ms. Hendricks could not recall any other comments, jokes,

or other demeaning comments based on race or gender.  *Id.*  The record in this case is devoid of

---

        [25] In fact, the only remotely derogatory incident Ms. Hendricks could recall relating to race
was that a co-worker told her that a newly-hired African American agent had to take a writing exam
and that a phone call had been made to his previous supervisors to confirm that he had no
misconduct issues prior to him being hired.  Hendricks Dep. 7/11/05 at 185.  Ms. Hendricks,
however, offered no evidence other than unsupported hearsay and speculation regarding the truth or
rationale for the requirements. *See id.*

evidence that Ms. Hendricks was forced to suffer any "discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  Defendant has proffered legitimate non-discriminatory reasons for the series of events that Ms. Hendricks alleges created a hostile work environment, and Ms. Hendricks has failed to establish that these reasons are pretextual.

### 1. Criticism of Plaintiff's Performance and Threatening to Rate Plaintiff As Failing If Her Performance Did Not Improve

Ms. Hendricks claims that her performance appraisals changed for the worse after she filed her EEO complaint.  *See* Hendricks Dep. 7/7/05 at 126.  In fact, her own testimony indicates that the criticism she received after her EEO complaint in 2002 was entirely consistent with the criticism she had received for many years prior to her complaint.  Before the period of protected EEO activity, Ms. Hendricks received criticism from managers against whom she does not allege discrimination. *See id.* at 126-135 (on performance appraisals for the periods covering June 1, 1997-May 1, 1998 and June 1, 1998 to May 1999, narratives suggest that Ms. Hendricks had a problem submitting her reports on time and that the reports often needed clarification).  Evaluations prior to the 2000 complaint evidence that Ms. Hendricks's deficiencies in preparing timely, clear reports was an ongoing concern.  The evaluations made repeated references to Ms. Hendricks's time consuming duties as TSO as a significant factor in the untimeliness of the reports.  *Id*. at 130-135.  Ms. Hendricks fails to carry her burden of showing that Defendant's legitimate, non-discriminatory reasons are pretextual.

To the extent that Ms. Hendricks alleges that she was threatened with failing marks

if her performance did not improve, SAC ¶ 68, this claim is without merit.  Ms. Hendricks received

passing evaluations for every single evaluation period except for her mid-year 2004 evaluation, at

which time she received a fail for two of the three critical elements.  For this period, however, Ms.

Hendricks acknowledges that the quality of her work decreased, including the quality of her writing

and the timeliness of her reports.  Hendricks Dep. 7/11/05 at 5-6.

### 2.  Removal of Plaintiff's Collateral TSO Duties

Plaintiff complains that in April 2000, her former supervisor, James Rice attempted

to remove her collateral duties as TSO.  SAC ¶ 72.  Ms. Hendricks's Complaint is misleading,

especially since she conceded at deposition that ASAC Rice sent an email reassigning several of the

collateral duties, including Ms. Hendricks's TSO duties, due to the assignment of new agents to

SIID.  Hendricks Dep. 7/7/05 at 142.  She also conceded that the removal of her TSO duties had no

effect on her pay, benefits, or job performance.  *Id.* at 148.  It strains credulity to see how removal

of Ms. Hendricks TSO duties could be considered discriminatory or retaliatory where it was well

documented (long before her 2000 EEO complaint) that Ms. Hendricks's collateral duties as TSO

interfered with her filing timely reports and forcing her to carry a smaller caseload than other agents.

Moreover, Ms. Hendricks acknowledges that she told her manager, Tim Camus, that she had

fulfilled the collateral duties for several years and no longer wanted the position.  *See id.* at 145.

This is not the stuff of discrimination or retaliation.

### 3.  Five-Year Background Update

In late-1999, the IRS, through its security office, initiated a routine five-year

background investigation of Ms. Hendricks.  Hendricks Dep. 7/11/05 at 54.  Ms. Hendricks

acknowledges that the initiation of this investigation was not discriminatory or retaliatory.  *Id.*  The

investigation revealed that Ms. Hendricks was having problems meeting her financial obligations. *See* Def.'s Ex. 31. As a result, Ms. Hendricks was notified by memorandum dated January 5, 2000, that a failure to meet financial obligations may raise concerns about an employee's security clearance and that her credit would be monitored for a 1 year period. *Id.* Ms. Hendricks notified the investigator that there were inaccuracies in the report and that she was going to provide a response to address them. Hendricks Dep. 7/11/05 at 55.

Following the one-year credit monitoring, Donna Copson, Associate Inspector General for Management Services (TIGTA's personnel function), indicated to Robert Cortesi, then-Deputy Inspector General for Investigations, that there had been little improvement in Ms. Hendricks's credit activity and that, as of December 11, 2000, Ms. Hendricks had provided no response to the January 5, 2000 memorandum. Def.'s Ex. 32. Management instructed Ms. Hendricks to take immediate action and allowed her to use two hours a day of administrative time to work on preparing a response to the memorandum. *See* Hendricks Dep. 7/11/05 at 66-68. She finally provided a response to the credit issues on December 27, 2000, approximately twelve months after receiving the initiating memorandum. Def.'s Ex. 33. Two months later, Donna Copson reported that Ms. Hendricks had satisfactorily addressed her credit issues. Hendricks Dep. 7/11/05 at 71. Ms. Hendricks alleges that monitoring her credit was discriminatory because Mr. Radetic was not given similar treatment when he declared bankruptcy. Pl.'s Issues at 65 (citing Radetic Dep. at 59-61). This allegation misses the mark.

First, Ms. Hendricks concedes that the initiation of the credit investigation was not discriminatory or retaliatory. Second, Ms. Hendricks concedes that the credit report used to make the findings leading to the credit monitoring was her credit report, and that each of the issues detailed

by TIGTA was present on that credit report.  Hendricks Dep. 7/11/05 at 59-62.  Third, Ms. Hendricks

concedes that she did not always pay her bills on a timely basis.  *Id.* at 56-57.  Finally, Ms. Hendricks

also concedes that her security clearance was not affected, that she was not suspended and that her

benefits were not diminished. *Id.* at 72.  Plaintiff has not shown that the credit monitoring had any

impact on her job, was discriminatory, or would have dissuaded a reasonable employee from

engaging in protected activities.

### 4. Removal from VRS

Withdrawal of permission for use of VRS may appear illogical to Ms. Hendricks but

that is the only argument she advances.  Pursuant to statute, federal law enforcement officers may

earn LEAP for working, or being able to work, an average of 2 extra hours per day, for which they

receive a salary increase of 25% of their base pay.  In accordance with the TIGTA Operations

Manual, Tim Herlihy conducted a review of quarterly LEAP hours on April 1, 2004.  Def.'s Mem.,

Ex. 37.  This review showed that Ms. Hendricks was not meeting her statutorily-required LEAP time

and was only averaging 1.5 hours per day.  *Id.*  Accordingly, Mr. Helihy issued Ms. Hendricks a

LEAP memo.  As set forth in the memo, Mr. Herlihy found Ms. Hendricks's failure to meet her

LEAP requirements particularly disturbing because she had failed to meet the time requirement for

the prior year, averaging only 1.8 hours per day, and had been previously directed to increase her

LEAP average.  *Id.*  To ensure that Ms. Hendricks met her LEAP time requirements, the memo set

forth a plan of action, including that Ms. Hendricks could no longer work at home under the VRS

program, that she would achieve a 2.0 hour average by June 30, 2004, and that she would maintain

a 2.0 hour average for the remainder of the year.  *Id.*

Ms. Hendricks alleges that her removal from VRS was "discriminatory because

everyone else in the office was allowed to work from home." Hendricks Dep. 7/30/005 at 121.  She

adds that she "was not the only agent who had failed to meet her Law Enforcement Availability Pay

hours." Pl.'s Issues at 66.  While this may be technically correct, Ms. Hendricks was the only agent

within SIID to fail to meet her LEAP requirements for 2003 *and* the 2004 first quarter review. *See*

Def.'s Reply at 58.   In addition, Ms. Hendricks concedes that under the rules governing the VRS

program, TIGTA employees must meet all of their employment requirements; TIGTA unilaterally

reserved the right to cancel VRS arrangements and instruct an employee to resume working at their

assigned duty station; a decline in employee performance is, according to the rules, grounds for

terminating VRS; and VRS is not an employee benefit.  Hendricks Dep. 7/11/05 at 122-124.  This

Court's review of the facts leading to the removal of Ms. Hendricks's ability to work from home

shows that there was nothing hostile, discriminatory, or retaliatory about the decision.  Rather, the

decision to remove Ms. Hendricks from VRS was a direct result of her failure to meet her statutorily-

mandated LEAP time.

### 5.  Letter of Reprimand

Ms. Hendricks also complains that she was subject to "unwarranted discipline" as part

of the alleged hostile work environment.  SAC ¶¶ 44-49.  This "unwarranted discipline" consisted

of a September 15, 2003, letter of reprimand issued to Ms. Hendricks by Tim Herlihy.  Def.'s Ex.

28.  As with the other acts that Ms. Hendricks alleges consitute a hostile work environment, the letter

of reprimand was not the result of a hostile work environment — it was the direct result of Ms.

Hendricks's own actions.

On April 13, 2003, Ms. Hendricks and Mr. Herlihy met with TIGTA counsel to

resolve a disagreement between the two regarding whether or not certain facts supported proceeding

with an investigation.  *See* Hendricks Dep. 7/11/05 at 25-26.  Mr. Herlihy did not believe that further

investigation was warranted but Ms.Hendricks did.  Following the meeting, Ms. Hendricks reviewed

her files and spotted information that she believed would affect the decision by counsel.  Ms.

Hendricks took this information to Mr. Herlihy, who instructed Ms. Hendricks not to send it to

counsel. Notwithstanding Mr. Herlihy's express order not to send the information to counsel, Ms.

Hendricks emailed counsel.  The email recognized that she was disregarding Mr. Herlihy's

instructions; she expressly stated that she had been instructed by Mr. Herlihy "not to provide

additional information to counsel, and to wait and see what opinion counsel rendered."  *See* Def.'s

Ex. 29.  The Court will not belabor the point.  Based on Ms. Hendricks's knowing disregard of Mr.

Helihy's directive to take no further action, he issued the September 15, 2003, letter of reprimand.

*See* Def.'s Ex. 28.  Accordingly, contrary to Ms. Hendricks's allegations, her own conduct, and not

her race, gender, or protected activity, was the reason for the letter of reprimand.[26]

### 6.  Failure to Select for Acting Assignments

The Second Amended Complaint also alleges that Ms. Hendricks was not selected

for "career-enhancing acting positions," while people outside of her protected class and who had not

participated in protected activity received such opportunities.  SAC ¶¶ 52-54.  As an initial matter,

Ms. Hendricks admits receiving a 30-day Acting Assistant Special Agent in Charge detail to the

Baltimore Field Office on the recommendation of Mr. Dwyer and Mr. Camus.  Hendricks Dep.

7/11/05 at 42-43.  In addition, by Ms. Hendricks's own admission, Jackie Colonna asked her if she

wanted to be considered for an acting position as ASAC of Technical Support Services because Ms.

---

[26]  The Court also notes that when Ms. Hendricks was asked at deposition if she knew of any instances of a Caucasian agent disregarding Mr. Herlihy's direct orders and not receiving a letter of reprimand she stated "No."  Hendricks Dep. 7/11/05 at 41.

Hendricks had experience as a tech agent. *Id.* at 50. Ms. Hendricks refused Ms. Colonna's offer because she wanted her SIID investigative inventory current. *Id.* Ms. Hendricks alleges that she was "eminently qualified for promotion on an acting and permanent basis." SAC ¶ 52. The Court cannot find that Ms. Hendricks was discriminated against or retaliated against based on her own subjective evaluations that she deserved more acting assignments, especially when she received one "acting" detail and declined another. *See Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (stating that pretext is not shown "simply based on [plaintiff's] own subjective assessment of [her] own performance"), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002).

## F. Constructive Discharge

A constructive discharge occurs when an employee quits her position due to working conditions that are not only "merely intolerable" but also "intolerable in a discriminatory way." *Chambers v. Am. Trans Air*, 17 F.3d 998, 1005-06 (7th Cir. 1994). "A plaintiff who advances such a compound [hostile work environment/constructive discharge] claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). "Constructive discharge thus requires a finding of discrimination and the existence of certain 'aggravating factors.' " *Munchin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1174 (D.C. Cir. 1981) ("These 'aggravating factors' are those things that would force an employee to leave.")). Thus, the inquiry focuses on whether the employer "creates or condones discriminatory working conditions that would drive a reasonable person to resign." *Katradis v. Dav-El of Washington, D.C.*, 846 F.2d 1482, 1485 (D.C. Cir. 1988). Moreover, a finding of intentional discrimination is a necessary predicate for a finding of constructive discharge. *Bishopp v. Dist. of Columbia*, 788 F.2d

781, 790 (D.C. Cir. 1986).   Measured against these objective standards, Ms. Hendricks's

constructive discharge claim must fail.

Ms. Hendricks states that "[t]he agency's actions in the final year of Ms. Hendricks's

employment created an environment that was physically and mentally unbearable for her."  Pl.'s

Opp. at 45.  She asserts that in the spring of 2004, after receiving a failing performance appraisal and

being told she would be placed on a PIP, it became apparent to Ms. Hendricks that she was going

to be terminated.  Hendricks Decl. ¶ 33.  At the same time, the agency left her unable to attend to her

medical needs.  Id. ¶ 34.  Ms. Hendricks proffers that her health worsened and that she was advised

by her treating mental health professional that she should leave her job.  Id. ¶¶ 35-36.  Finally, faced

with the ruination of her career, mounting health concerns, and the inability to seek needed medical

treatment, Ms. Hendricks asserts that she was justified in resigning.  Id.  ¶¶ 32-37.  While the Court

admits that Ms. Hendricks's situation was not ideal, especially in light of her health, she has not

established the necessary predicate for a finding of constructive discharge.

First, as discussed above, the Court has found no unlawful discrimination in the

parade of horribles that Ms. Hendricks claims assailed her at TIGTA from 2000 to 2004.  Mr.

Johnson, Mr.Geary, Mr. McKeever, and Mr. Radetic were all better qualified candidates chosen

through the normal selection procedures of TIGTA.  This pattern of selectioms cannot reasonably

be considered an intolerable environment pervaded with discrimination.  Particularly telling with

respect to Ms. Hendricks's discrmination claim is the fact that she testified that no one in TIGTA

had every made any disparaging remarks to her about her race or gender.  Hendricks Dep. 7/11/05

at 185.  In fact, until Ms. Hendricks resigned, she was still receiving "high profile" complaints to be

investigated.  See Phillips Decl. at 6.  Ms. Hendricks's claims illuminate an environment of

disappointment, but not an environment of discrimination.  Her claim of a hostile work environment

based on discrimination or retaliation must fail.

## IV.  CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [Dkt. #31]

will be granted.  A memorializing Order accompanies this Memorandum Opinion.

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: October 4, 2007